IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Subpoena to NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION | ) ) ) ) Misc. Action No.: 19-MC- ) |
| CITYNET, LLC, on behalf of the United States of America, | ) ) ) ) *(Related Case in the United States District Court of the Southern District of West Virginia: Case No. 2:14-CV-15947)* |
| Plaintiff/Relator, | ) |
| v. | ) ) |
| FRONTIER WEST VIRGINIA INC., et al. | ) ) |
| Defendants. | ) |

**THE FRONTIER DEFENDANTS' MEMORANDUM IN SUPPORT
OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Movants Frontier West Virginia Inc. ("Frontier"), Kenneth Arndt, Mark McKenzie, and Dana Waldo ("Frontier Defendants"), by and through undersigned counsel, and pursuant to Rule 45(d)(2)(B)(i) of the Federal Rules of Civil Procedure, respectfully move this Court to compel the National Telecommunications and Information Administration ("NTIA") to produce documents responsive to the Frontier Defendants' *subpoena duces tecum*. In support of this Motion, the Frontier Defendants state as follows:

**INTRODUCTION**

In the underlying False Claims Act action in the Southern District of West Virginia, the relator has alleged that the Frontier Defendants made misrepresentations in connection with a grant funded project. The relator brings these claims despite the fact that Frontier was fully transparent both with the grant recipient (the Executive Office of the State of West Virginia) and NTIA. When

the federal government already knows of the facts and circumstances underlying alleged fraud, it weighs against any findings of materiality or scienter. The Frontier Defendants have issued a narrowly tailored subpoena to NTIA seeking to obtain relevant documents concerning the government's knowledge. NTIA has objected but fails to meet its burden of showing that the subpoena imposes undue burdens. Accordingly, the motion to compel should be granted.

## BACKGROUND

### A.  Procedural History

Citynet brought the underlying action in the Southern District of West Virginia under the *qui tam* provisions of the False Claims Act, and filed its Complaint under seal on May 7, 2014. On June 17, 2016, the United States announced that it had declined to intervene, and the Court unsealed the case on June 28, 2016. Citynet filed its First Amended Complaint on July 18, 2016. *See* First Amended Complaint, Exhibit A.

The Frontier Defendants moved to dismiss on multiple grounds on August 23, 2016. On March 30, 2018, the Court granted the motion in part and denied in part. Based on the False Claims Act's public disclosure bar, the Court dismissed Counts I and V with respect to conduct after March 23, 2010. *See* Memorandum Opinion, Exhibit B. On the remaining claims, trial is set to begin on August 27, 2019.

On January 30, 2019, the Frontier Defendants served a *subpoena duces tecum* on NTIA under Rule 45 of the Federal Rules of Civil Procedure (the "Subpoena"). *See* Subpoena, Exhibit C. On February 12, 2019, NTIA, through the United States Department of Commerce Office of General Counsel, objected to the Subpoena and refused to produce any documents or information in response. *See* DOC Letter, Exhibit D. NTIA objected to the Subpoena on the ground that it did not comply with the Department of Commerce's *Touhy* regulations. *See* 15 C.F.R. § 15.14(c)(3).

2

Specifically, NTIA argued: (1) the Frontier Defendants failed to show that the documents requested were not reasonably available from another source; (2) certain documents are publicly available; (3) other documents are protected from disclosure by the deliberative process privilege and/or the attorney-client privilege; and (4) certain documents are protected from disclosure by the nature of the proprietary, confidential, or sensitive information that they contain. *See* Exhibit D, at 1-2.

On February 26, 2019, the Frontier Defendants and NTIA conferred in good faith regarding NTIA's objections to the Subpoena through telephonic conference but were unable to resolve this discovery dispute. As explained in further detail below, the Frontier Defendants attempted to find ways to limit the document requests in a manner that would address NTIA's objections, but NTIA stated flatly that it was choosing not to participate in discovery in this matter and that it would not produce documents.

**B.     Background on West Virginia's BTOP Grant**

In the American Recovery and Reinvestment Act of 2009 ("Recovery Act"), enacted on February 17, 2009, Congress directed NTIA to establish "a national broadband service development and expansion program." 47 U.S.C. § 1305. Congress appropriated $4.7 billion for the broadband expansion program, which was part of the government's efforts to stimulate the economy. Recovery Act, Pub. L. 111-5, div. A, tit. II, 123 Stat. 115, 128 (2009). The program was known as the Broadband Technology Opportunities Program ("BTOP"), and one of its key objectives was to provide broadband access to community support organizations, such as schools, libraries, and healthcare providers. 47 U.S.C. § 1305(b)(3)(A).

On July 9, 2009, NTIA issued a Notice of Funds Availability ("NOFA"), making funds available for, among other things, "grants for deploying broadband infrastructure in unserved and

underserved areas." NOFA, 74 Fed. Reg. 33104 (July 9, 2009). On August 20, 2009, the Executive Office of the State of West Virginia ("EOWV") submitted an application seeking $126,323,297 to build, among other things, fiber connections to community anchor institutions ("CAIs") such as schools, libraries, and healthcare facilities. In its application, EOWV proposed to construct broadband infrastructure under an existing statewide contract with Frontier.[1]

NTIA awarded a BTOP grant to EOWV on February 1, 2010. At the request of NTIA, EOWV later made Frontier a sub-recipient of the grant. The sub-award was formalized in a Memorandum of Understanding effective October 1, 2010 ("MOU"). *See* Exhibit B at 12. Under the MOU, Frontier agreed to provide network facilities and other services for EOWV to implement a portion of the Grant pursuant to the MPLS Contract. *Id.*

C. **Allegations in the First Amended Complaint**

1. **Citynet alleges that EOWV's grant application contained misrepresentations.**

Citynet alleges that EOWV's grant application contained representations, which were intended to induce NTIA to award a grant to EOWV with Frontier as a sub-recipient. Citynet alleges that the misrepresentations were based in part on information provided by the Frontier Defendants.

According to Citynet, EOWV represented in its application that Frontier would build fiber from the CAIs back to Frontier's central offices, where other service providers would be able to

---

[1] As a result of a competitive bidding process in 2007, EOWV already had a contract with Frontier to build a Multi-Protocol Layer Switching network for the executive agencies under the jurisdiction of the West Virginia Office of Technology ("MPLS Contract"). The original signatories to the MPLS Contract were MCI Communications Services, Inc. d/b/a Verizon Business Services and Verizon West Virginia Inc. ("Verizon West Virginia"). After Frontier Communications Corporation acquired Verizon West Virginia (completed June 30, 2010), the company was renamed Frontier West Virginia Inc.

interconnect. (Am. Compl. ¶¶ 2, 4, 39-40.) But instead of building back to the central office, Citynet contends, Frontier built "tails" to the CAIs "from the nearest Frontier hub or similar facility." (*Id.* ¶ 56; *see also id.* ¶¶ 4, 78, 83.) Citynet complains that this was last mile infrastructure, "essentially rendering the newly constructed facilities useless to competitors," and "thus defeating the open access conditions set forth in the grant award." (*Id.* ¶¶ 4, 84.)

Citynet further alleges that EOWV misrepresented that 1,064 CAIs would receive fiber connections under the grant, when in fact 416 CAIs already had existing connections. Citynet also alleges that much of the middle mile infrastructure already existed. As a result, Citynet alleges that EOWV's application misrepresented the number of miles of fiber to be built using grant funds. According to Citynet, EOWV's grant application also inflated the number of miles of fiber by calculating the distance for each CAI back to the central office, even when two CAIs were located next to each other.

### 2. Citynet Alleges That, In Some Instances, Frontier Built Less Fiber than Estimated in Its LCRs

Citynet next alleges that Frontier billed the BTOP grant "for material and labor it did not provide, and for fiber lengths that were not constructed." (Am. Compl. ¶ 86.) Citynet points to several Location Construction Request and Approval Forms ("LCRs") and states that the LCRs were bills that Frontier submitted to the State. (*Id.* ¶¶ 88-90.) Citynet contends that Frontier's engineering maps show that it constructed less fiber than stated in some LCRs and that some of the fiber it provided was placed in maintenance coils. (*Id.*) Citynet also complains that the maintenance coils were "excessive."[2] (*Id.* ¶¶ 6, 87.)

---

[2] A maintenance coil (or "slack loop") is the extra cable stored at a particular facility. Service providers use them to repair damaged fiber and to connect new fiber to the network.

3.     **Citynet Alleges That Frontier Improperly Billed Indirect Costs to EOWV**

Citynet alleges that Frontier's bills to EOWV contained impermissible indirect costs. It argues that EOWV failed to identify any indirect costs in the budget that it submitted to NTIA and consequently that indirect costs were not reimbursable. Citynet alleges that Frontier's invoices to West Virginia contained a "loadings" charge that was an impermissible indirect cost under the terms of the BTOP grant. (Am. Compl. ¶ 100.) Citynet also alleges that Frontier improperly billed invoice-processing fees related to facility build out ("FBO") charges from Frontier's vendors, and that Frontier "double-billed" the FBO charges. (*Id.* ¶ 111.)

**STANDARD**

Rule 45 of the Federal Rules of Civil Procedure provides that "a party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). When the recipient of a subpoena objects and refuses to produce documents in response, "the serving party may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i). In this instance, Frontier's Subpoena directs production to be made to the Washington, D.C. office of McGuireWoods LLP, as counsel for the Frontier Defendants. Thus, the instant action properly lies in this District.

In this District, "a challenge to an agency's refusal to comply with a Rule 45 subpoena should proceed and be treated not as an APA action but as a Rule 45 motion to compel." *Watts v. SEC*, 482 F.3d 501, 508 (D.C. Cir. 2007); *cf. Agility Pub. Warehousing Co. K.S.C. v. Dep't of Defense*, 110 F. Supp. 3d 215, 220 (D.D.C. 2015) (applying the APA's arbitrary and capricious standard as the "sole remedy for the *state-court* litigant" (emphasis added)). When reviewing a motion to compel, Rule 45 requires that district courts quash or modify subpoenas that call for

privileged matter or would cause an undue burden. *See* Fed. R. Civ. P. 45(d)(3); *see also In re Micron Tech., Inc. Sec. Litig.*, 264 F.R.D. 7, 9 (D.D.C. 2010) (quoting *Watts*, 482 F. 3d at 509). The agency resisting the subpoena bears the burden of showing that the requested documents are unduly burdensome or privileged. *Id.* (citing *Alexander v. FBI*, 192 F.R.D. 42, 46 (D.D.C. 2000)).

### ARGUMENT

I. <u>**THE SUBPOENA DOES NOT IMPOSE UNDUE BURDEN OR EXPENSE**</u>

NTIA bears the burden of showing that the Supboena imposes undue burden or expense. "This is a heavy burden," *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984), and one that NTIA cannot meet. The requested documents are highly relevant to the underlying litigation and narrowly tailored so as not to impose undue burden on NTIA. The motion to compel should be granted.

"To determine whether a subpoena imposes an 'undue burden,' courts balance several factors, including '[the] relevance [of the materials sought], the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *Educ. Fin. Council v. Oberg*, No. 10-MC-0079 JDB, 2010 WL 3719921, at *2–3 (D.D.C. Mar. 8, 2010) (quoting *Flatow v. Islamic Rep. of Iran*, 202 F.R.D. 35, 36 (D.D.C. 2001)) (omitting internal quotation marks). "Also 'potentially relevant' to this analysis is 'whether the discovery is "unreasonably cumulative or duplicative"; whether the discovery sought is "obtainable from some other source that is more convenient, less burdensome, or less expensive"; and whether "the burden or expense of the proposed discovery outweighs its likely benefit."'" *Id.* (quoting *Watts*, 482 F.3d at 509 (quoting Fed. R. Civ. P. 26(b))).

A. **The Requested Documents Are Relevant to the Underlying Litigation**

There can be no dispute that the requested documents are relevant to the claims made by Citynet in the underlying litigation, and NTIA's objections do not suggest otherwise. The government's knowledge of key facts is relevant to both materiality and scienter.

1. **The requested documents are relevant to whether the alleged misrepresentations were material.**

The discovery sought by the Frontier Defendants is relevant to the question of materiality. As the Supreme Court recently held, a misrepresentation is not actionable under the False Claims Act unless the misrepresentation was material to the government's payment decision. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016). In *Escobar*, the Supreme Court stated that the False Claims Act's "materiality standard is demanding," and clarified "how that materiality requirement should be enforced." *Id.* at 2002-03. The Supreme Court stated that "materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id.* at 2002 (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003) (Williston)); *see also* 31 U.S.C. § 3729(b)(4) (defining "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property").

Significant to this matter, the Supreme Court noted that the government's payment of a claim despite having knowledge of alleged noncompliance is relevant to the question of materiality. *Escobar*, 136 S. Ct. at 2003-04 ("Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not

8

material.") Additionally, the government's failure to take remedial action after being fully informed of the alleged noncompliance further points to lack of materiality. *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 86 (D.D.C. 2018).

Here, there is ample reason to believe that NTIA had knowledge of the circumstances that Citynet claims gave rise to misrepresentations. For example, Citynet filed a formal protest with NTIA on September 9, 2010, asserting that EOWV planned to use grant funds to build last mile infrastructure instead of middle mile infrastructure. NTIA responded in detail on November 29, 2010, concluding Citynet's allegations were unfounded. Citynet's allegations were also reported in the press. *See* Exhibit B at 57-60. Indeed, these public disclosures were the basis for the Southern District of West Virginia's dismissal of Counts I and V.[3] Moreover, NTIA had regular conferences with EOWV and Frontier regarding the specific routes and CAIs that would receive fiber. In fact, NTIA directed EOWV and Frontier not to overbuild existing fiber.

There is also reason to believe that NTIA had knowledge of the loadings charges. The Department of Commerce's Office of Inspector General ("OIG") conducted an investigation of the loadings issue and concluded that EOWV knew about and approved Frontier's loadings charges. EOWV also sought an opinion from an audit firm and ultimately discussed the issue with NTIA:

> In a July 2013 email, a State of West Virginia official wrote the NTIA official, stating that "[n]ear the end of June, [we] discussed via phone indirect (Frontier) charges relating to loading, etc." The NTIA official responded that "I talked to a [West Virginia official] and we determined that this was not an issue." In an email sent to other relevant officials at the State of West Virginia, the same State official stated that "NTIA and I discussed the indirect charges issue

---

[3] Although the Court denied dismissal of Counts I and V with respect to conduct that preceded March 23, 2010, all claims for payment in this matter were made after March 23, 2010. The Frontier Defendants take the position that the Court's ruling effectively dismissed Counts I and V in their entirety, but Citynet disputes that position.

and [the NTIA official] has indicated he does not consider it to be a problem."

OIG, Investigative Report No. 14-0480, 12 (June 2017), https://www.oig.doc.gov/ OIGPublications/OIG_Report_No_14-0480_West_Virginia_BTOP.pdf. The NTIA official later denied that he knew about or approved loadings, *id.*, but this is a question of fact that the Frontier Defendants should be allowed to explore through third party discovery.[4]

Additionally, it is undisputed that NTIA knew about the FBO invoice processing fees. The OIG stated in its report that "[e]mails establish that in May 2013 an NTIA official received and reviewed the 11-step FBO invoice process outlined in Frontier's memorandum to the State of West Virginia and agreed with a State official's initial determination that the costs were direct charges." *Id.* While there are other facts that the OIG says NTIA was not aware of, the extent of the government's knowledge is clearly a proper subject of discovery.

If the documents show that NTIA knew about the circumstances that Citynet contends gave rise to misrepresentations, then that supports the Frontier Defendants' argument that Citynet cannot prove the element of materiality.

### 2. The requested documents are relevant to whether the Frontier Defendants acted with the requisite scienter.

The government's knowledge is also relevant to the element of scienter. "[T]he government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation." *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (holding that government agency's "full knowledge of the material facts underlying any representations implicit in [the defendant's]

---

[4] NTIA also received notice of Frontier's indirect costs when it received a copy of the program-specific audit of Frontier in 2014 (which found no material deficiencies).

conduct negates any knowledge that [the defendant] had regarding the truth or falsity of those representations"); *see also United States ex rel. Hagood v. Sonoma Cty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (holding that government's knowledge "may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth"); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) (noting government's concession that "[t]he fact that a contractor has fully disclosed all information to the government may show that the contractor has not 'knowingly' submitted a false claim, that is, that it did not act with 'deliberate ignorance' or 'reckless disregard for the truth'"); *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 543 (7th Cir. 1999) (declining to hold defendant "liable for defrauding the government by following the government's explicit directions").

In *United States ex rel. Butler v. Hughes Helicopter Co.*, the relator alleged noncompliance by the defendant in connection with avionics and navigations subsystems provided for the Apache helicopter. No. CV 89-5760 SVW (TX), 1993 WL 841192, at *1 (C.D. Cal. Aug. 25, 1993). But the district court found that the defendant and the Army "engaged in open dialogue and informal negotiation concerning . . . testing requirements, procedures and results" and that "the Army was aware of, all of the difficulties experienced with the Subsystems." *Id.* at *14. "Given the government's knowledge of and accession at every turn to the Subsystems' testing modifications as well as to the Subsystems' limitations, Relator did not present legally sufficient evidence that any allegedly false statement or claim was made with the requisite intent." *Id.* Similarly, in *United States v. Newport News Shipbuilding, Inc.*, the court held that "[a] contractor's disclosure of its accounting practices to the government is relevant, not because government knowledge of a misrepresentation shields a contractor from liability, but because evidence of disclosure may 'point[ ] persuasively away from any conclusion that [the contractor] made a knowing

11

misrepresentation.'" 276 F. Supp. 2d 539, 564 (E.D. Va. 2003) (quoting *X Corp. v. Doe*, 816 F. Supp. 1086, 1094 (E.D. Va. 1993)).

As noted above, there is evidence that NTIA was involved in planning as fiber routes were designed for the BTOP project and that it had knowledge of loadings and FBO invoice processing fees. The requested discovery is relevant to the Frontier Defendants' defense that they were fully open about the design of the BTOP routes as well as the charges included on Frontier's invoices.

**B.    The Document Requests Are Reasonable In Scope**

The specific requests in the Subpoena are narrowly tailored to discover facts and documents relevant to the Frontier Defendants' defenses. *See Oberg*, 2010 WL 3719921, at *4 (enforcing subpoena where party requested all communications related to a narrowly tailored topic area). Moreover, the potential value of this case makes granting the requested discovery all the more reasonable. Citynet is seeking more than $130 million in damages and civil penalties based on the amounts paid to Frontier under the BTOP grant. As the real party in interest, the government stands to collect at least 70 percent of any judgment that Citynet might receive. The inconvenience to NTIA must be balanced against not only the potential damages but the government's potential recovery. *See Northrop Corp.*, 751 F.2d at 407 (holding that "large sums of money at stake is relevant in determining the reasonableness of the subpoena"). Indeed, "[a] reasonable inconvenience must be borne to further the goals of discovery—the making available to litigants all relevant and available information." *Id.*

**C.    The Requested Documents Are Not Reasonably Available from Another Source**

Frontier cannot reasonably attain many of the documents that it seeks in the Subpoena from any source other than the NTIA. In its refusal to produce documents in response to the Subpoena, NTIA states that "some of the documentation sought . . . may be available from . . . the State of

West Virginia." Exhibit D, at 2. And the Frontier Defendants have served a subpoena on EOWV, which would overlap to at least some degree with the Subpoena to NTIA. *See* Exhibit E. Frontier and EOWV have met and conferred regarding that subpoena, and EOWV has indicated that it will cooperate in producing documents, but Frontier has received no documents from EOWV to date. Moreover, the Court can determine from the face of the Subpoena that certain documents sought are not available from any other source. Without NTIA's documentation, Frontier is at a fundamental disadvantage to defend itself against accusations that it defrauded that very agency.

### D. NTIA Has Made No Attempt to Negotiate Limitations to the Subpoena

The burden of asking the Court to quash a subpoena "is particularly heavy . . . as contrasted to some more limited protection." *Westinghouse Elec. Corp. v. City of Burlington, Vt.*, 351 F.2d 762, 766 (D.C. Cir. 1965) (quoting *Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421, 425 (1st Cir. 1961)) (omitting internal quotation marks). Here, the Frontier Defendants offered to explore limitations on the Subpoena during the February 26, 2019 telephone call, including limiting the production to documents solely in NTIA's possession, but NTIA rejected the proposal. NTIA has made no effort to explore limitations on the Subpoena that would address its concerns and thus there is no basis for quashing the Subpoena. *See id.* ("Appellants have expressed their willingness to accept some reasonable effort by the Government, that would be less than a page-by-page search. The lower court, in these circumstances, should have sought some way to accommodate the interests of the defendants herein with the practical problems of searching the Government's voluminous files. Nothing in the record suggests that the possibility of making a less than complete search was explored.").

## II. NTIA FAILS TO SUPPLY A PRIVILEGE LOG TO JUSTIFY ITS CLAIMS OF PRIVILEGE

NTIA has made no search of its records, but theorizes that the document requests in the Subpoena implicate both the deliberative process and attorney-client privileges. In the absence of any information concerning the documents over which NTIA is asserting privilege, however, the Court cannot quash the Subpoena. *See, e.g., Gouse v. D.C.*, No. CV 17-2566 (RDM), 2019 WL 188382, at *10 (D.D.C. Jan. 14, 2019) (holding that "little evidence—and no detail" provided by movant meant that the court could not assess application of deliberative process privilege). Indeed, neither the Frontier Defendants nor the Court can assess NTIA's claims of privilege in the absence of a privilege log. *See* Fed. R. Civ. P. 45(e)(2)(A) (stating that a "person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must (i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim"); *see also In re Apollo Grp., Inc. Sec. Litig.*, 251 F.R.D. 12, 17 (D.D.C. 2008) (noting that court could not assess privilege claims "in the absence of a privilege log"). NTIA should be required to produce a privilege log for any documents it is withholding on a claim of privilege.

## III. CLAIMS OF CONFIDENTIALITY MAY BE ADDRESSED IN A PROTECTIVE ORDER

NTIA has refused to comply with the Subpoena arguing that the Frontier Defendants request information that "*may* also be protected from disclosure as containing proprietary information [or] . . . information that it protected from disclosure as . . . confidential, or sensitive." Exhibit D, at 2 (emphasis added). To protect confidential and proprietary information from disclosure, NTIA could produce any such documents or information to Frontier pursuant to the

Agreed Protective Order already in place in the Southern District of West Virginia. *See* Agreed Protective Order, Exhibit F. Alternatively, the Frontier Defendants and NTIA could fashion and agree to a separate protective order to resolve any concerns the NTIA may have that the existing Agreed Protective Order does not otherwise address. The alleged confidential nature of the information encompassed by the Subpoena does not prevent that material from being disclosed. *See Agility*, 110 F. Supp. 3d at 228-29 (noting, for example, that while the Trade Secrets Act prevents disclosure of certain commercial and financial information, a court order to so disclose overcomes that prohibition).

As with its assertions of privilege, NTIA baldly refuses to comply with the Subpoena because doing so *might* disclose proprietary, confidential, or sensitive information. Again, NTIA fails to demonstrate why production of such documents under an appropriate protective order would cause it undue burden. Consequently, NTIA should be compelled to produce the requested documents.

### IV.   THE *TOUHY* REGULATIONS DO NOT CONFER A PRIVILEGE FROM THIRD PARTY DISCOVERY

NTIA appears to argue that it gets to choose whether to comply with a Rule 45 subpoena. That is not the case. As the D.C. Circuit has noted, "[a]n agency's *Touhy* regulations are relevant for internal housekeeping and determining who within the agency must decide how to respond to a federal court subpoena." *Watts*, 482 F.3d at 508-09; *see also Yousuf v. Samantar*, 451 F.3d 248, 257 (D.C. Cir. 2006) (describing *Touhy* regulations as establishing "method[ ] by which . . . an agency would respond to a subpoena"). *Touhy* regulations do not confer a privilege or other basis for objecting to a subpoena. *Id.* at 509; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. MC07489PLFJMFAK, 2010 WL 11613859, at *2-3 (D.D.C. Sept. 9, 2010). Rather, "the legal basis for any opposition to the subpoena must derive from an independent source of law such as a

governmental privilege or the rules of evidence or procedure." *Id.* (quoting 9 James Wm. Moore et al., Moore's Federal Practice § 45.05[1][b] (3d ed. 2006)). Indeed, the statute authorizing *Touhy* regulations specifically states that it "does not authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301.

Here, the Frontier Defendants complied with the requirements of the Department of Commerce's *Touhy* regulations. *See* 15 C.F.R. § 15.14(c)(3). The Frontier Defendants served the Subpoena and provided a declaration as required by the regulation. NTIA complains that the Frontier Defendants fail to show that the documents are not reasonably available from another source, but the Frontier Defendants addressed the fact that "NTIA's internal communications and memoranda" could not be obtained from any other party. Exhibit C, at 9, ¶ 4. And, in any event, the Subpoena does not impose an undue burden as would justify quashing the Subpoena.

## CONCLUSION

For all of the above-stated reasons, Frontier requests this Court enter an Order compelling NTIA to produce documents in response to Frontier's *subpoena duces tecum* within fourteen (14) days from the Court's Order.

Dated: March 22, 2019

Respectfully submitted,

MOVANT FRONTIER WEST VIRGINIA INC.

By counsel,

*/s/ Elizabeth A. Hutson*
Charles Wm. McIntyre (D.C. Bar No. 489302)
Elizabeth A. Hutson (DC Bar No. 1024845)
McGuireWoods LLP
2001 K Street, NW, Suite 400
Washington, DC 20006
(202) 857-1700
cmcintyre@mcguirewoods.com

ehutson@mcguirewoods.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of March, 2019, I sent a true copy of this filing to counsel of record listed below by e-mail and first class mail, postage pre-paid:

Benjamin L. Bailey
Rebecca L. Donnellan-Pomeroy
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301-1386

Nicholas S. Preservati
Spilman Thomas & Battle
P. O. Box 273
Charleston, WV 25321-0273

*Counsel for Citynet, LLC*

Gary E. Pullin
Stephen M. Fowler
Geoffrey A. Cullop
Christopher C. Ross
Pullin Fowler Flanagan Brown & Poe, PLLC
901 Quarrier Street
Charleston, WV 25301

*Counsel for Jimmy Gianato and Gale Given*

Russell W. Craig
U.S. Dept. of Commerce, Office of the
General Counsel
1401 Constitution Avenue NW
Washington, D.C. 20230
(also to be served by process server pursuant to
Fed. R. Civ. P. 4 (c)(2))

Kathy Smith
NTIA, Office of the Chief Counsel
1401 Constitution Avenue NW
Washington, D.C. 20230

*Counsel for National Telecommunications and Information Administration*

Jennifer M. Mankins
U.S. Attorneys' Office
P.O. Box 1713
Charleston, WV 26326-1713

Augustine Martin Ripa
U.S. Dept. Justice, Civil Division
Patrick Henry Bldg., Rm. 9209
601 D Street NW
Washington, DC 20004

_Elizabeth A. Hutson_
Elizabeth A. Hutson (DC Bar No. 1024845)
McGuireWoods LLP
2001 K Street, NW, Suite 400
Washington, DC 20006